Wick v. Wick, Appellant.
Wick, Appellant, v. Wick.

Argued April 26, 1944. Before KELLER, P. J., BALD-RIGE, HIRT, KENWORTHEY, RENO and JAMES, JJ. (RHODES, J., absent).

*Alex A. Garroway,* with him *G. W. Smith,* for appellant.

*W. A. Blair,* with him *Thos. N. Griggs,* of *Griggs & Moreland,* for appellee.

OPINION BY KELLER, P. J., September 27, 1944:

The appellant brings before us two appeals in divorce

proceedings, which were argued together. In No. 194 he appeals from the decree of the court below granting his wife a divorce *from bed and board* on the ground of indignities to her person such as to render her condition intolerable and life burdensome. In No. 195 he appeals from the decree of the same court refusing to grant him a divorce *from the bond of matrimony* on the grounds of cruel and barbarous treatment and indignities to his person, etc., and dismissing his libel.

Appellant withdrew from his home on Wallingford Street, Pittsburgh, the common domicile, on July 7, 1942. The wife filed her libel asking for a limited divorce with alimony on May 28, 1943. He filed his libel asking for an absolute divorce on July 2, 1943. The cases were tried together before Judge McDONALD on December 9, 1943.

On June 1, 1943, a few days after filing her libel, the wife filed a bill in equity to No. 1965 July Term, 1943, praying for an injunction restraining her husband from filing, commencing or prosecuting any action or actions for divorce in any state or commonwealth except the Commonwealth of Pennsylvania. A preliminary injunction issued and was served on her husband on the same day. His motion to dissolve the preliminary injunction was refused on June 7, 1943, and the injunction was continued. His answer to the bill, raising questions of law, was overruled. He appealed from this order to the Supreme Court (No. 148 March Term, 1943). The appeal was quashed on June 30, 1943.

We have carefully read and re-read the nearly five hundred pages of testimony composing this joint record and are of opinion that neither party has established by clear and convincing evidence his or her right, as an injured and innocent spouse, to a divorce—that the husband has not made out a clear case entitling him to an absolute divorce and that the wife has not made out a clear case entitling her to a divorce from bed and board.

We agree with the learned court below that neither libellant made out a case against the other of cruel and barbarous treatment, endangering the life of the injured and innocent spouse, sufficient to justify a divorce on that ground. The divorce in each case must stand or fall on the charge that the respondent offered such indignities to the person of the libellant as to render her or his condition intolerable and life burdensome.

We will follow the course adopted by the trial court, and will first consider the husband's libel, asking for a divorce from the bond of matrimony.

The trial judge was plainly irked by, what he termed, the 'colossal conceit' of the libellant, manifested by his self-laudation, his habit of unnecessarily lugging into his testimony the names of prominent personages whom he knew, and his statement that if he had been elected a delegate to the Republican National Convention in 1940, either his friend, Governor John Bricker, or Robert Taft "would probably have had the Republican Nomination" (234a). We are wholly free of any bias or prejudice resulting from these matters, and yet agree on the whole with the conclusion of the court below as expressed in its opinion: "We do not believe that Mrs. Wick has been entirely free from all criticism or blame, or that she is entirely free from censure. We do believe that there have been arguments and discussions between Mr. and Mrs. Wick which have exceeded in intensity the arguments which so often arise between husband and wife. However, taken all in all, and after reading all the testimony in this case, and after having heard all of the witnesses in the case, we are not satisfied that Mrs. Wick's conduct toward Mr. Wick has been such as to be labeled an 'indignity' according to our law. We are not satisfied that the conduct of Mrs. Wick towards Mr. Wick has at any time been such as to render his condition intolerable or his life burdensome."

The evidence, in our opinion, reveals Mrs. Wick as

a jealous wife, neurotic, possessive, accustomed to having her own way, and persistent in her attempts to secure it, who might be very difficult to live with, but who, nevertheless, loved her husband in her way, and whose conduct, while blameworthy in some respects, did not, as a whole, fall within the criteria laid down as the usual indicia of the indignities which render the condition of the injured party intolerable, to wit, "vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement": *Sharp v. Sharp,* 106 Pa. Superior Ct. 33, 35, 161 A. 453.

We think the testimony of Mrs. Grace Cousins, the cook, was very revealing:

"Q. [By Mr. Garroway, counsel for Mr. Wick] Tell us what you saw. A. There was never any violence, any loud arguments but it was always—oh, I don't know how to tell you how it is. Q. Just in your own words. A. No matter what Mr. Wick ever wanted to do, it was always what Mrs. Wick wanted to do, and she would always win her point in a very—oh, that kind of a way, you know how water drips and drips on something and wears it down finally. Well that is how. Q. Did you ever hear any arguments? A. The only thing I ever heard would be: 'Well, Margaret, let us do this', It would be: 'Daddy, don't you think we should do *this*', and then *that* is what they would do. Q. And Mr. Wick would do what Mrs. Wick would ask? A. Absolutely."

Mr. Wick's testimony pointed out her unwillingness to let any argument which arose between them drop, until it was settled her way. She would follow him from room to room and keep it up for hours at a time. We can understand his desire to live separate and apart from her. But that does not, of itself, justify a divorce. Incompatibility is not ground for divorce in Pennsylvania.

The most objectionable of Mrs. Wick's actions occurred after Mr. Wick left the home, and were largely provoked by what the trial judge called his openly and notoriously flouting the conventions of society by "constantly and repeatedly appearing in public" with a young woman or young women employed by him in various business enterprises in which he was engaged as an officer of the corporation or trustee in bankruptcy. We cannot agree with the court below that these amounted to a 'public scandal'. No such evidence appears in the record, and both counsel for Mrs. Wick and the court disclaimed any intention of charging any personal misconduct between Mr. Wick and his employees, or any of them. But they were contrary to the ordinary conventions of society and served to mitigate to some extent and partially excuse some of his wife's acts that, without them, would have been inexcusable.

With respect to the wife's suit for a divorce from bed and board, we are not in accord with the court below.

The trial judge, although displeased with Mr. Wick's self-laudation, himself made some reference to the "hundreds upon hundreds of cases involving marital difficulties" which he had tried. He was not referring to divorce cases, for he has not been a judge of the court of common pleas long enough to have heard that many *divorce* cases. He was probably referring to proceedings for maintenance and support that he had heard, while a judge of the County Court of Allegheny County. The issues are not precisely the same. The wife is entitled to maintenance and support from her husband unless by her conduct she has clearly forfeited her right to the same. Mrs. Wick is, no doubt, entitled to reasonable support and maintenance from her husband; and, no doubt, is getting it. But a wife is not entitled to a divorce from her husband—even a divorce from bed and board—unless she is an injured and innocent party.

534

The granting of such a decree puts the seal of the court's approval on her actions towards her husband; and there is much in this record of Mrs. Wick's doings, even after excluding actions provoked by him, which should not have the approval of the court.

We fail to find in the record, prior to her husband's withdrawal from the home, anything that warranted her unreasonable jealousy, culminating in her *pseudo* attempts at suicide, or that justified her charges and insinuations at the trial that he was going around with his secretary, other than in a purely business way. And in her encounters with the latter, Mrs. Wick had no cause or occasion for resorting to billingsgate, or calling his secretary the vile and opprobrious name she applied to her. See *Stoner v. Erisman*, 206 Pa. 600, 602, 56 A. 77. On these occasions, the secretary seems to have been the only one who acted as a *lady*.

Judge Kenworthey, speaking for this court, in *McKrell v. McKrell*, 155 Pa. Superior Ct. 297, 38 A. 2d 507, has pointed out that "We live in a modern world in which women increasingly are engaged in business and the professions in pursuit of which men must associate with them. And 'even a jealous woman owes to her husband a duty not to misinterpret circumstances or incidents unless she is willing to bear the consequences'", citing *Andrew v. Andrew*, 121 Pa. Superior Ct. 152, 182 A. 706.

In so far as the evidence relates to trips, taken after the filing of her libel, on which Mr. Wick was accompanied by two or more of his young women employees— which, as to them, were only pleasure trips—although it is conceded that no personal misconduct took place with any of them, it was sufficiently provocative of his wife's actions to take Mr. Wick out of the class of an 'injured and innocent spouse' as respects his libel. But Mrs. Wick's actions, prior to said trips, regarding his secretary, who was also secretary for the President of

the Fort Pitt Bridge Company, of which Mr. Wick was Executíve Vice President, were such as to take her out of the class of an 'injured and innocent spouse' as respects her libel.

No good purpose would be served by further discussion of the details in either action.

No. 194 April Term 1944—The decree is reversed and the libel is dismissed.

No. 195 April Term, 1944—The decree is affirmed.

The costs in both actions to be paid by the appellant.